## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NANCY ESAW,

                Plaintiff,

       v.

COMCAST CABLE
COMMUNICATIONS MANAGEMENT,
LLC,

               Defendant.

No. 17-cv-06295

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment. (Dkt. 81.) Plaintiff Nancy Esaw is a Black woman over the age of forty who worked for Defendant Comcast Cable Communications Management, LLC from April 2004 through December 2015. Plaintiff argues that Defendant wrongfully terminated Plaintiff because of unlawful age and race discrimination and in retaliation for filing complaints. Defendant now moves for summary judgment on all counts, arguing that it terminated Plaintiff because of her dissatisfactory job performance, particularly because of an incident when she treated a customer unprofessionally on a phone call.

Defendant's motion for summary judgment is granted in its entirety. As explained below, Plaintiff has failed to meet her burden to show a triable issue on whether she met her former employer's legitimate expectations and whether her race and age played a role in her dismissal. On the contrary, the evidence developed in discovery unambiguously reflects that Plaintiff was terminated because of her

performance deficiencies and generally hostile and disruptive attitude toward coworkers, supervisors, and customers of Defendant. Accordingly, Defendant is entitled to judgment in its favor on all counts.

## I.    BACKGROUND

### A.    The Parties.

Plaintiff Nancy Esaw is a Black female who was 56 years old in the relevant year of 2015. (Dkt. 91 ¶ 1.) Plaintiff was employed by Defendant Comcast Cable Communications Management, LLC from April 2004 through December 2015. (*Id.* ¶¶ 1–2.) Defendant, a large cable TV and internet service provider, hired Plaintiff to work as a Customer Account Executive at an Illinois call center. (*Id.* ¶ 4.) From 2007 through early 2014, Plaintiff transitioned to a Residential Account Representative position in a different Illinois office until that position was eliminated after a company reorganization. (*Id.* ¶¶ 4–5.) Plaintiff's title changed to Community Account Representative ("CAR"), and she held that position throughout the remainder of her employment with Defendant. (*Id.* ¶ 5.) As a CAR, Plaintiff was responsible for several properties with multiple residential units such as apartments and condominiums. (*Id.* ¶ 6.) Given that Plaintiff's primary responsibility was to increase subscribers within these properties, she frequently visited them. (*Id.*)

Over the course of Plaintiff's employment, Plaintiff was required to maintain a standard of conduct in accordance with Defendant's Employee Handbook and Code of Ethics and Business Conduct (the "Handbook"). (*Id.* ¶ 11.) The Handbook required Plaintiff to treat customers courteously and efficiently. (*Id.* ¶ 12.) The Handbook also

provided several examples of inappropriate misconduct: unprofessional or rude treatment of customers, insubordinate interactions with supervisors, and the use of profanity or other inappropriate tones. (*Id.* ¶¶ 12–13.) Plaintiff acknowledged and agreed to these terms during her employment with Defendant. (*Id.* ¶¶ 14–15.)

Defendant also maintained a Corrective Action Policy designating levels of corrective action when needed; Plaintiff was subject to this policy during her employment. (Dkt. 102 ¶¶ 86–87.) If needed, corrective action under the policy was intended to "bring areas of required improvement to the employee's attention in order to change behavior and improve performance." (*Id.* ¶ 86.) Although Defendant's Corrective Action Policy designated progressive levels of discipline as standard practice, Defendant reserved the right to break that standard practice and accelerate discipline if an employee's behavior was "severe" and required "immediate removal." (*Id.* ¶ 88.)

### B. Plaintiff's Performance Evaluations and Behavioral Problems.

From 2012 to 2015, Plaintiff received corrective actions from three separate supervisors, including two written warnings, two verbal warnings, and one coaching memorandum.[1] (*Id.* ¶ 16.) Plaintiff disputes that these corrective actions "accurately represent the true events that transpired" but agrees that she received them and was not demoted or fired as a result of receiving these warnings. (*Id.* ¶¶ 16–17.)

---

[1] Plaintiff objects to these statements as irrelevant, arguing that these warnings "had nothing to do with Plaintiff's termination." (Dkt. 91 ¶ 16.) But Defendant's motion for summary judgment relies in part on the argument that Plaintiff was not meeting Defendant's legitimate expectations. (*See* Dkt. 82 at 6–7; Dkt. 101 at 5–6.) Warnings that Plaintiff received during the course of her employment are thus directly relevant to this argument.

Each of Plaintiff's performance evaluations for the years 2011 through 2014 rated various categories of Plaintiff's job performance as "needs improvement." In Plaintiff's 2011 performance evaluation, Plaintiff's supervisor stated that she wanted Plaintiff to "work on self-development in communication and interpersonal development and increase the quantity of property visits and events." (*Id.* ¶ 19.) Plaintiff's 2012 evaluation similarly instructed Plaintiff to "develop building a rapport with others" and to "be more open to coaching." (*Id.* ¶ 20.) After receiving some customer complaints in 2013, Plaintiff's 2013 performance evaluation instructed Plaintiff to "continue to work on developmental areas" of communication, interpersonal effectiveness, and customer focus. (*Id.* ¶ 21.) And because Plaintiff's supervisor had "received many complaints from other departments [and] teammates" about Plaintiff" (*id.* ¶ 24), Plaintiff's 2014 evaluation also instructed Plaintiff to "improve on her interpersonal skills." Plaintiff's supervisor stated that she considered Plaintiff's communication style and tone to be "unprofessional, inappropriate, and disrespectful." (*Id.*) Plaintiff agrees that these performance evaluations exist, but she disputes that the evaluations accurately reflect her work performance during the relevant time periods.[2] (*Id.* ¶¶ 19–21, 24.)

---

[2] Plaintiff also argues that these statements about her performance evaluations should be disregarded because Defendant is seeking to use them as inadmissible character evidence under Rule 404(b) of the Federal Rules of Evidence, and because Defendant has failed to produce authentic copies of each evaluation as required by Rule 901 of the Federal Rules of Evidence. (Dkt. 91 ¶¶ 19–21, 24.) As an initial matter, because Local Rule 56.1 statements "are not appropriate vehicles for moving for [evidentiary] relief," the Court disregards any evidentiary arguments Plaintiff makes in her Local Rule 56.1 statement. *See Samuels v. Schneider Nat'l Carriers*, No. 15 C 8468, 2018 WL 4590329, at *4 n.2 (N.D. Ill. Sept. 25, 2018). Even if Plaintiff's approach was procedurally appropriate, Defendant does not cite Plaintiff's performance evaluations and disciplinary actions to make a statement on Plaintiff's

During these years, Plaintiff also received various warnings and reprimands from her supervisors in response to inappropriate emails Plaintiff had sent, as well as other unprofessional behavior. In April 2013, for example, Plaintiff emailed her manager the following remarkably impudent demand: "Please be prepared to discuss at today's meeting. For some reason you have many excuses and no results." (*Id.* ¶ 22.) Plaintiff's manager responded with a request that Plaintiff refrain from using such "curt demeanor" with her supervisors. (*Id.*) In January 2014, Plaintiff sent an email to several managers concerning the job performance of another employee whom Plaintiff did not supervise, to which Plaintiff's manager again responded with an emailed reprimand. (*Id.* ¶¶ 26–27.)

There are other examples of Plaintiff's poor performance. In November 2014, Plaintiff's manager met with Plaintiff to "give her coaching on her behavior and communication style" after Plaintiff spoke to the manager with a "very rude tone [and] attitude." (*Id.* ¶ 30.) In February 2015, Plaintiff participated in a ride-along training with other CARs in which she "refused to fully participate," including refusing to get out of the van at customer sites and leaving the ride-along early. (*Id.* ¶ 32.) Plaintiff received a verbal warning as a result of her behavior during the ride-along. (*Id.* ¶ 35.) During a CAR team meeting in September 2015, Plaintiff "was very

---

propensity to act in a certain manner or in accordance with a particular trait of character. Defendant, rather, relies on these facts to show Plaintiff's employment history with Defendant and the history of behavioral problems she experienced. *See.* Fed. R. Evid. 404(a)(1). As to Plaintiff's authentication arguments, the authenticity of a piece of evidence such as Plaintiff's performance evaluations may be proved in ways other than presenting the original and "authentic" copy of said evaluations. *See* Fed. R. Evid. 901. Plaintiff's objections based on Rules 404 and 901 are thus overruled.

negative, combative, and disrespectful to her peers," an attitude that led to a meeting with her manager. (*Id.* ¶¶ 36–37.) Plaintiff's manager suggested that Plaintiff take certain training courses to help "improve her peer relationships and interpersonal communications," but Plaintiff did not take the suggested courses. (*Id.* ¶ 37.) Through October and November 2015, Plaintiff appeared late or failed to appear at several company events and meetings. (*Id.* ¶¶ 38–41.)

Citing these incidents, Plaintiff's manager issued Plaintiff a formal written warning for her "very poor and inappropriate behavior, such as demonstrating a combative attitude, lack of respect toward the job and leadership, and insubordination." (*Id.* ¶ 42.) At that time, Plaintiff's manager and other supervisors were not yet considering terminating Plaintiff's employment. (*Id.* ¶ 44.) This corrective action was instead meant to inform Plaintiff that her behavior was unacceptable and to give Plaintiff time to correct it, in accordance with Defendant's progressive corrective action policy. (Dkt. 102 ¶ 92.) Plaintiff's supervisor testified that he did not immediately present this corrective action to Plaintiff because Plaintiff was on vacation. (*Id.* ¶ 90.) Plaintiff's supervisor intended to present the disciplinary action to Plaintiff on the day she returned from vacation, but opted not to do so based on Plaintiff's behavior during a fateful customer call that occurred on the day Plaintiff returned from vacation. (*Id.*)

Plaintiff was terminated following that November 30, 2015 customer call. As the record reflects, Plaintiff and a customer were speaking over the phone about a billing issue. (Dkt. 91 ¶ 45.) Several of Plaintiff's coworkers overheard the phone call

6

and testified that Plaintiff's attitude during the call was very disrespectful and rude. One coworker testified that he had "never heard any employee speak to a Comcast customer in as inappropriate and disrespectful manner" as Plaintiff spoke during the November 30 call. (*Id.* ¶ 46.) Multiple coworkers testified that they had overheard Plaintiff mocking the customer's accent, stating that she did not have time for the customer's call, and giving the customer a countdown to end the call. (*Id.* ¶¶ 47–48.) Another coworker who overheard the call testified that Plaintiff was "irritated, impatient, and raised her voice" with the customer. (*Id.* ¶ 49.) Plaintiff viewed the call as "normal and "successful." (*Id.* ¶ 51.)

After Plaintiff ended the phone call, Plaintiff's supervisor, Eric Asante, immediately met with Plaintiff (*Id.* ¶ 50.) Asante had also overheard the phone call, and he felt that Plaintiff "was very loud with the customer" and made "rude, combative and disrespectful" statements to the customer. (*Id.* ¶ 46.) Asante thus scheduled a meeting with Plaintiff to discuss her "loud, inappropriate, and disrespectful" treatment of the customer. (*Id.* ¶ 50.) Asante then reported Plaintiff to Defendant's Human Resources department. (*Id.* ¶ 51.) Human Resources spoke to the several coworkers who had overheard Plaintiff's phone call, all of whom stated that they believed Plaintiff's behavior was "inappropriate" and "one of the most egregious violations of the [Handbook]" they had encountered. (*Id.* ¶¶ 53–57.) A day after the November 30 call, Asante also contacted the customer who Plaintiff had spoken to, apologizing for Plaintiff's conduct on the call. (*Id.* ¶ 52.) The customer stated that she

felt that Plaintiff had disrespected her on the call and discriminated against her because she was a "foreigner." (*Id.*)

Plaintiff met with a Human Resources representative and Asante on December 4, 2015 to discuss the November 30 phone call. (*Id.* ¶ 58.) During this meeting, Plaintiff was "combative," "defensive," "uncooperative," "loud," "disruptive," and "started yelling." (*Id.* ¶ 59.) But by the end of the meeting, Plaintiff understood that her supervisors believed that her handling of the November 30 phone call was inappropriate. (*Id.* ¶ 58.) At the conclusion of the meeting, Plaintiff was placed on administrative leave. (*Id.* ¶ 59.) On December 7, 2015, Plaintiff was terminated. (*Id.* ¶ 60.) Defendant states that Plaintiff was terminated "solely because of her inappropriate conduct during the November 30, 2015 customer call and her other inappropriate and insubordinate behavior." (*Id.* ¶ 62.)

### C.    Plaintiff's Discrimination Allegations.

Plaintiff alleges that Defendant terminated her, not because of the alleged misconduct, but because of her age and race. (Dkt. 92.) Plaintiff cites several facts in support of her claims. In 2007, according to Plaintiff, a coworker told her that she "doesn't sound like a black person." (Dkt. 91 ¶ 63.) In 2008, another coworker told Plaintiff that she was a "different kind of black person . . . contrary to the derogatory stereotype of African-American families" and that "management didn't like [Plaintiff] because she was black." (*Id.* ¶ 64.) In 2012, a manager decided to assign a project to a "white, young male" employee instead of Plaintiff. (*Id.* ¶ 66.) In 2014, one coworker told Plaintiff that the skirt Plaintiff was wearing was "a little short for your age," and

another coworker asked how old Plaintiff was. (*Id.* ¶¶ 70, 71.) Plaintiff's supervisors testified that they do not recall Plaintiff filing any complaint of discrimination. (*Id.* ¶¶ 74, 77, 80.)

Plaintiff disputes this, arguing that she formally complained about discrimination to Human Recourses in 2012 and 2013. (Dkt. 102 ¶ 82.) But Plaintiff also admits that these "formal" complaints were phone calls Plaintiff made to Defendant's helpline after Plaintiff received verbal and written warnings from her supervisors. (*Id.*) Plaintiff states that she intended to report race and sex discrimination during these helpline calls. (*Id.*) Summaries of these phone calls do not record any allegation that Plaintiff believed she was being discriminated against, and Defendant recorded the phone call complaints as "Unfair Treatment (Not Discrimination)." (*Id.*) Plaintiff filed a charge of race and age discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 7, 2016. (*Id.* ¶ 18; Dkt. 1-1.)

### D. Procedural Background.

On August 30, 2017, Plaintiff filed a three-count Complaint against Defendant alleging (1) violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) violation of the Age Discrimination in Employment Act ("ADEA"); and (3) retaliation. (Dkt. 1.) Plaintiff alleges that Defendant discriminated against Plaintiff on the basis of her race and age, and that Defendant unlawfully terminated Plaintiff's employment in retaliation for Plaintiff reporting unlawful conduct. (*Id.*) Defendant did not seek to dismiss the complaint, and the parties engaged in

9

discovery. (*See* Dkt. 37–65.) Following the close of discovery, Defendant moved for summary judgment and filed a corresponding Local Rule 56.1 statement of material facts. (Dkt. 81; 82.) Plaintiff filed an opposition brief to the motion for summary judgment as well as a Rule 56.1 statement of material facts. (Dkt. 91; 92.)

## II.    STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III.    DISCUSSION

Plaintiff alleges that Defendant terminated her employment and discriminated against Plaintiff based on her race and age in violation of Title VII and

the ADEA (Counts I and II).[3] Plaintiff further alleges that Defendant retaliated against her for engaging in protected activity, also in violation of Title VII and the ADEA (Count III).

## A. Defendant's Statute of Limitations Argument.

Defendant first argues in its motion for summary judgment that Plaintiff's claims are time-barred because Plaintiff did not timely file an EEOC complaint. (Dkt. 82 at 5.) A plaintiff "who asserts Title VII and AEA claims has 300 days from the alleged discriminatory or retaliatory act to file a timely charge of discrimination with the EEOC." *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 744 (7th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B)). Plaintiff filed an EEOC charge on April 7, 2016. (Dkt. 1-1.) Plaintiff's alleged discriminatory or retaliatory act thus must have happened on or after June 12, 2015—300 days before April 7, 2016.

Defendant argues that the verbal and written warnings it issued to Plaintiff happened between March 2012 and February 2015, all of which occurred before the start of the 300-day period. (Dkt. 82 at 5.) Defendant explains that, even if those warnings were timely, they did not lead to any job consequences, so they cannot be "considered actionable adverse employment actions." (*Id.*) *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance

---

[3] To the extent Plaintiff has attempted to assert a hostile work environment claim under Title VII or the ADEA, the claim fails because Plaintiff has not responded to Defendant's argument relating to a hostile work environment claim. (Dkt. 101 at 4.) *See Hernandez v. Rhee*, No. 18-cv-07647, 2021 WL 3408510, at *8 (N.D. Ill. Aug. 4, 2021) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) (a "failure to respond . . . results in waiver").

evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions.").

But the parties agree that Defendant terminated Plaintiff's employment on or about December 7, 2015. (*See* Dkt. 91 ¶¶ 60–62.) Termination of employment is considered a materially adverse employment action for purposes of discrimination and retaliation claims. *See Duncan v. Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 919 (N.D. Ill. Mar. 21, 2011). Plaintiff's termination was within the 300-day statute of limitations for Plaintiff's EEOC discrimination claims. In other words, Plaintiff's adverse employment action happened on or after June 12, 2015. Accordingly, because the evidence shows that Plaintiff suffered an adverse employment action and filed an EEOC charge within the 300-day statute of limitations, Plaintiff's claims are not time-barred.

**B.    Title VII and ADEA Race and Age Discrimination Claims.**

Plaintiff contends that Defendant committed race and age discrimination in violation of Title VII and the ADEA based on her identity as a Black woman over forty years old. Defendant argues that it is entitled to summary judgment on Plaintiff's Title VII and ADEA discrimination claims because the undisputed material facts demonstrate that Plaintiff cannot establish a *prima facie* case of discrimination, nor can Plaintiff show that Defendant's decision to terminate Plaintiff were pretextual. (*Id.* at 6–11.) Because Plaintiff's race and sex discrimination claims arise from the same set of facts, they will be addressed together.

    *1.  Legal Standard.*

  Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discrimination against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.§ 623(a)(1). The ADEA "protects workers 40 years of age and older from age-based employment discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018).

  A plaintiff can prove a Title VII or ADEA discrimination claim either through the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or in a "holistic fashion" under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Under either approach, the Court must look at the record as a whole, and the "critical question is whether the plaintiff has produced enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race, [age,] or other proscribed factor caused the adverse employment action. *Chatman*, 5 F.4th at 746; *Baraona v. Vill. of Niles*, 720 F. Supp. 3d 601, 614 (N.D. Ill. Mar. 8, 2024). Both of these approaches are addressed below.

2.    McDonnell Douglas *Test.*

Under the *McDonnell Douglas* burden-shifting approach, the plaintiff is first required to make a prima facie case of discrimination: (1) plaintiff belongs to a protected class; (2) plaintiff met her employer's legitimate expectations; (3) plaintiff suffered an adverse employment action; and (4) another similarly situated employee out of the protected class received better treatment from the employer. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Marshal v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020)). If the plaintiff makes this showing, the burden shifts to the employer to offer a nondiscriminatory motive. *Id.* (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext. *Id.* (quoting *Purtue*, 963 F.3d at 602).

Plaintiff cannot establish a *prima facie* case of race of age discrimination. As to the first element of a *prima facie* case, the parties agree that, at all relevant times, Plaintiff, as a Black woman over the age of 40, was a member of classes that are protected by Title VII and the ADEA. It is also undisputed that Plaintiff suffered an adverse employment action (her termination). But the parties disagree as to whether Plaintiff was (1) meeting legitimate performance expectations; and (2) treated worse than similarly situated employees.

Plaintiff's age and race discrimination claims both fail under the *McDonnell Douglas* framework. To begin, Plaintiff has not raised a genuine dispute of material fact concerning her failure to meet Defendant's legitimate expectations. As the

14

undisputed evidence shows, Plaintiff struggled with poor attendance, disruptive behavior, and disrespectful and insubordinate communications in the final years of her employment with Defendant. This behavior led to several written and verbal warnings, meetings with supervisors, and coaching memoranda. These incidents culminated in Plaintiff's termination after Plaintiff treated a customer disrespectfully during a telephone call. Several of Plaintiff's coworkers, including Plaintiff's supervisor at the time, overheard Plaintiff's interactions on that call and testified that Plaintiff was disrespectful, rude, and inappropriate. Plaintiff's behavior during that interaction, along with the other various behavioral incidents described above, show that Plaintiff was not meeting Defendant's legitimate expectations.

Plaintiff's disagreement with Defendant's assessment of her job performance is insufficient to create a legitimate issue of fact. Simple disagreement with negative evaluations does not mean that Plaintiff's termination was a result of unlawful discrimination. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011). As the Seventh Circuit has repeatedly held, a federal court is "not a super-personnel department that [can] substitute [its] criteria for an employer's for hiring, promoting, or disciplining employees." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020). Determining whether an employee is meeting an employer's legitimate expectations thus "mandates looking at [the employee's] job performance through the eyes of her supervisors at the time of her termination." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008); *see also Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 310 (7th Cir. 2012); *Brian J. Murphy v. Caterpillar Inc.*, No. 21-cv-1282,

2024 WL 520020, at *10 (N.D. Ill. Feb. 9, 2024). Whether the supervisor's performance ratings were right is not the question, but instead "whether the employer's description of its reasons were honest." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (quoting *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)). As the undisputed evidence shows through the eyes of Plaintiff's supervisor at the time of her termination, Plaintiff was not meeting the supervisor's legitimate expectations.

Plaintiff maintains that a reasonable jury could still find that she was meeting Defendant's legitimate expectations because Defendant did not act *honestly*. (*See* Dkt. 92 at 10–14.) Plaintiff first argues that Defendant did not honestly believe Plaintiff acted inappropriately during the November 30 call because one of Plaintiff's coworkers, who "sat directly across from Plaintiff during the entire call," testified that Plaintiff spoke in an "elevated tone" during the call and was not screaming at anyone. (*Id.* at 11.) Plaintiff also argues that Defendant did not honestly believe Plaintiff should be fired because Defendant did not immediately decide to terminate Plaintiff and because Defendant deviated from its standard disciplinary policies. (*Id.* at 12–13.)

Plaintiff presents no evidence of this purported dishonesty. At best, Plaintiff presents evidence of inconsistencies in her coworker's memory, and inconsistencies in Defendant's disciplinary proceedings. The undisputed evidence also shows that this same coworker testified that Plaintiff's tone during the November 30 call was alarming, and her conduct was inappropriate and unprofessional. (*See* Dkt. 102

¶¶ 97, 101–02.) Moreover, the undisputed evidence shows that Defendant sometimes diverted from its standard disciplinary proceedings in special circumstances. These inconsistencies do not suggest that Defendant acted dishonestly, nor do they suggest a genuine issue of material fact as to Defendant's decision to terminate Plaintiff. *Igasaki*, 988 F.3d at 958 ("conclusory" statements alleging dishonesty must be supported by evidence of dishonesty to defeat summary judgment).

Plaintiff's age and race discrimination claims also fail under the *McDonnell Douglas* framework because Plaintiff did not identify a similarly situated employee who received better treatment than her. A "similarly situated employee" "need not be identically positioned" with the plaintiff, but must be " 'directly comparable' to the plaintiff 'in all material respects.' " *Id.* (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). Plaintiff points to no similarly situated employee who received better treatment than did she. In fact, Plaintiff's sole argument in support of her position is that Defendant "could not identify a single employee terminated for 'behavior-related' reasons like Plaintiff." (Dkt. 92 at 15.) But the burden to identify a similarly situated employee is Plaintiff's, not Defendant's, and Plaintiff has not named a single employee who was a substantially younger non-Black employee in a similar job position whom Defendant treated more favorably. This dearth of evidence makes it "functionally impossible" for the Court to engage in the similarly-situated inquiry. *See Igasaki*, 988 F.3d at 958.

Because Plaintiff was not meeting Defendant's legitimate expectations, and because Plaintiff cannot identify a similarly-situated employee who was treated more

favorably, Plaintiff fails to assert a *prima facie* case for age and sex discrimination under the *McDonnell Douglas* framework.

       *3.*    Ortiz *Test*.

Plaintiff's case also fails under the *Ortiz* test. *Ortiz* requires the Court to look at the totality of the evidence holistically, "eschewing any framework or formula," to determine whether that evidence shows discrimination. *Igasaki*, 988 F.3d at 958 (quoting *Ortiz*, 834 F.3d at 765); *see also Igasaki v. Ill. Dep't of Fin. & Prof. Regul.*, No. 15-cv-03693, 2018 WL 4699791, at *5 (N.D. Ill. Sept. 30, 2018) (a plaintiff "may still be able to defeat summary judgment if the evidence, viewed as a whole, would allow a reasonable juror to conclude that his [protected characteristic] caused his termination"); *Arnold v. United Airlines, Inc.*, No. 22 C 405, 2024 WL 2938843, at *8 (N.D. Ill. June 11, 2024) ("Under the holistic approach established in *Ortiz*, the evidence is viewed in the aggregate to determine whether it allows an inference of prohibited discrimination.").

Plaintiff presents a handful of incidents to support her claim that she was "repeatedly subjected to derogatory remarks about her sex, race and age by colleagues and supervisors." (Dkt. 92 at 3.) Plaintiff states that she reported to Defendant's Human Resources department that "she was being subjected to unlawful discriminatory treatment based on her sex, race and age." (*Id.*) These allegedly discriminatory remarks were made intermittently between 2007 and 2015. (*See* Dkt. 91 ¶¶ 63–80.) Plaintiff contends that these remarks are enough to show that Defendant terminated her because of her race and age. They are not. Even when

viewed in the light most favorable to Plaintiff, the evidence does not show that Plaintiff's race or age played a role in Plaintiff's termination; said another way, Plaintiff does not connect her termination to the alleged "derogatory remarks" about her age and race. Plaintiff has thus "put forward no evidence suggesting that [Defendant] . . . harbors any prejudice" toward Plaintiff because of her race or age. *See Igasaki*, 2018 WL 4699791, at *5.

In contrast, Defendant has put forth extensive undisputed evidence showing that it terminated Plaintiff for legitimate, non-discriminatory reasons—namely, Plaintiff's negative performance reviews, history of corrective actions, and unprofessional treatment of a customer during the November 30, 2015 phone call. Accordingly, after considering the totality of the evidence, the Court finds under *Ortiz* that no reasonable jury could have found that Defendant discriminated against Plaintiff based on her race or age.

*          *          *

Plaintiff has failed to carry her burden to show that her race or age played a role in her termination. On the contrary, the evidence shows that Defendant fired Plaintiff for reasons based solely on Plaintiff's poor performance. Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's Title VII and ADEA discrimination claims.

## C. Retaliation Claim.

In Count III, Plaintiff argues that she was "subjected to unlawful employment actions in retaliation for engaging in protected activity by, among other things,

19

reporting and/or opposing unlawful work conduct." (Dkt. 1 ¶ 39.) Defendant also moves for summary judgment on this Count.

Title VII prohibits retaliation against employees who engage in protected activity, such as filing a charge under Title VII or opposing an unlawful employment practice. 42 U.S.C. § 2000e-3(a); *Baraona*, 720 F. Supp. 3d at 625. Similarly, the ADEA prohibits employers from retaliating against an employee who complains of discrimination. 29 U.S.C.§ 623(d); *Brian J. Murphy*, 2024 WL 520020, at *16. To succeed on a retaliation claim, Plaintiff must produce evidence to allow a reasonable jury to conclude that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a but-for causal connection between the two. *See Chatman*, 5 F.4th at 748 (Title VII); *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020) (ADEA).

Plaintiff argues that she engaged in the protected activity of "reporting that she believed she was subjected to discrimination based on her race, sex and age." (Dkt. 92 at 14; Dkt. 102 ¶ 82.) Plaintiff is apparently referring to the complaints she made to Defendant's hotline in 2012 and 2013: complaints Defendant recorded as "Unfair Treatment (Not Discrimination)." (Dkt. 102 ¶ 82.) Plaintiff alleges that she was terminated because she made these complaints. (Dkt. 92 at 14.) Plaintiff supports this position by citing one occasion in which one of Plaintiff's managers told Plaintiff to "Stay out of HR." (*Id.*; Dkt. 91 ¶ 77.)

But even when the Court draws all reasonable inferences in Plaintiff's favor, it cannot hold that a reasonable jury would conclude that Plaintiff's complaints were

the but-for cause of her termination. Plaintiff's "wholly undeveloped" argument fails to put forth sufficient evidence establishing that link. *See Baraona*, 720 F. Supp. 3d at 626. To start, Plaintiff filed these complaints years before Plaintiff was terminated. *See Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (an inference of retaliation "can be weakened by a lengthy time period between the protected activity and the alleged retaliation"). In addition, the undisputed facts show that the manager who allegedly told Plaintiff to "stay out of HR" was not aware of Plaintiff's complaints; this manager could not have possibly made that statement in retaliation for Plaintiff's complaints. (*See* Dkt. 91 ¶ 77.) Finally, the record reflects that Plaintiff's poor job performance, in particular her conduct on the November 30 phone call, directly prompted Defendant to terminate Plaintiff's employment. No reasonable jury could be convinced that Plaintiff was terminated in retaliation for making complaints. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## IV. CONCLUSION

Defendant's motion for summary judgment is granted.

SO ORDERED in No. 17-cv-06295.

Date: March 31, 2025

_____
JOHN F. KNESS
United States District Judge